Tina M. VARLESI, Plaintiff,

v.

**WAYNE STATE UNIVERSITY, et al., Defendants.**

**Civil Action No. 10–CV–14793.**

United States District Court, E.D. Michigan, Southern Division.

Feb. 16, 2012.

Deborah L. Gordon, Deborah L. Gordon Assoc., Bloomfield Hills, MI, for Plaintiff.

Megan P. Norris, Muhammad Misbah Shahid, Miller Canfield Paddock & Stone, Heather G. Ptasznik, John T. Below, Kotz, Sangster, Lauren M. Phillips, Patrick F. Hickey, Dykema Gossett PLLC, Detroit, MI for Defendants.

*OPINION AND ORDER (1) GRANTING DEFENDANT THE SALVATION ARMY'S MOTION FOR SUMMARY JUDGEMENT, (2) GRANTING DEFENDANT JOYCE STEFANSKI'S MOTION FOR SUMMARY JUDGMENT, and (3) GRANTING IN PART AND DENYING IN PART THE SUMMARY JUDGMENT MOTION OF DEFENDANTS WAYNE STATE UNIVERSITY, CAROL PREMO, ANWAR NAJOR–DURACK, PHYLIS I. VROOM, SHAWNA J. LEE, MARGARET BRUNHOFER, AND ANTONIO GONZALES–PRENDES*

MARK A. GOLDSMITH, District Judge.

## I. INTRODUCTION

Plaintiff Tina M. Varlesi, a former graduate student enrolled at Wayne State University's School of Social Work, alleges that she was unlawfully dismissed from the program because she was unwed and pregnant. Defendants are: (1) Wayne State University (WSU), (2) Carol Premo, (3) Anwar Najor–Durack, (4) Phyllis I. Vroom, (5) Shawna J. Lee, (6) Antonio Gonzales–Prendes, (7) Margaret Brunhofer, (8) The Salvation Army (SA), and (9) Joyce Stefanski. Defendants (2) through (7) are faculty at WSU. Defendant (9) is an employee of SA, one of the entities at which Plaintiff performed her field placement internship.

Plaintiff asserts seven claims in her Second Amended Complaint:

Count I: Sex, pregnancy, and marital-status discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (Title IX). Plaintiff also mentions sexual harassment in this count. This count is asserted against WSU, SA, Premo, Durack, and Vroom.

Count II: Retaliation in violation of Title IX. This claim is asserted against WSU, SA, Premo, Durack, and Vroom.

Count III: Sex, pregnancy, and marital-status discrimination in violation of Michigan's Elliott–Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* (ELCRA). This count is asserted against Premo, Durack, and Vroom.

Count IV: Sex, pregnancy, and marital-status discrimination in violation of the ELCRA. This count is asserted against SA and Stefanski.

Count V: Retaliation in violation of the ELCRA. This count is asserted against Premo, Durack, Vroom, SA, and Stefanski.

Count VI: Substantive and procedural due process violations under the Fourteenth Amendment to the United States Constitution. This count is asserted against Premo, Durack, Vroom, Lee, Prendes, and Brunhofer.

Count VII: Tortious interference with a contractual relationship and tortious interference with a business expectancy. This count is asserted against Stefanski.

Now before the Court are three defense motions for summary judgment: one each by SA (Dkt. 54) and Stefanski (Dkt. 55), and one by WSU, Premo, Durack, Vroom, Lee, Brunhofer, and Prendes (Dkt. 56).[1] All three motions are fully briefed, and oral argument was heard on December 15, 2011. For the reasons that follow, the Court will grant the first two motions in their entirety and grant in part and deny in part the motion of the WSU Defendants.

## II. BACKGROUND

Plaintiff began as a Master's degree student at WSU's School of Social Work (MSW) in the fall of 2006. WSU Statement of Material & Undisputed Facts (WSU Fact) # 1. The two-year program is designed to prepare students for an advanced-level professional social work practice. WSU Fact # 3. To successfully complete the program, students must complete academic coursework and sixteen credit hours (225 hours) of field placement. WSU Fact # 4. According to WSU's Field Education Manual, the field work component "helps student integrate classroom learning and reinforce course content." Pl. Ex. B at 10. Plaintiff excelled academically, earning a 3.67 grade point average. Pl. Ex. F; Statement of Additional Material Facts (Pl. Fact) # 28. She also successfully performed her field placement requirement at Spectrum Human Services, a child welfare agency, during her first year of the program, earning strong performance reviews from her field supervisors. Pl. Exs. G & H; Pl. Facts ## 16–27.

During the first semester of her second year, Plaintiff was first placed at the Veterans Administration Hospital (VA) to complete her field work. WSU Fact # 33. Defendants say that Plaintiff was "terminated" from this assignment due to performance issues. Plaintiff says that she "refused to return" to the VA. WSU Facts ## 47–48; Pl. Fact # 64. Regardless, the record reflects that Plaintiff did not perform adequately while at the VA in the opinion of her supervisor, Pamela Mackey. Pl. Ex. 11. Mackey, a clinical social worker at the VA and Plaintiff's field supervisor, wrote a detailed letter to WSU in

---

1. The Court refers to Defendants WSU, Premo, Durack, Vroom, Lee, Brunhofer, and Prendes collectively as "the WSU Defendants." The Court refers to the individual defendants (*i.e.*, Premo, Durack, Vroom, Lee, Brunhofer, and Prendes) as "the Individual WSU Defendants."

which she expressed "very serious concerns about [Plaintiff's] work ethic, values, and goals." WSU Ex. 11. In the letter, Mackey states that she requested from WSU that Plaintiff "not be allowed to return [to work at the VA]." *Id.* In addition, Mackey submitted an evaluation of Plaintiff to WSU, in which Mackey assigned "does not meet" ratings in approximately 30 of 53 categories. Pl. Ex. 11. Plaintiff received "marginal" ratings in the bulk of the remaining categories. *Id.*

Early during her placement at the VA—on September 24, 2007—Plaintiff learned that she was pregnant. Plaintiff immediately informed Premo (her faculty advisor) and Mackey. WSU Fact # 37.

Plaintiff was originally given a grade of "incomplete" for her VA internship, but Premo later decided to give Plaintiff "another chance" and changed the grade to "satisfactory." WSU Facts ## 26, 64. Premo testified that she could not justify failing Plaintiff because she could not discern whether Plaintiff's poor evaluation was the result of incompetence/inability or simply a poor working relationship with Mackey. Premo Dep. at 96. Premo knew that Plaintiff was pregnant when she elected not to fail her. WSU Fact # 58.

For her final field internship, Plaintiff was assigned to SA and, specifically, the Romulus Adult Rehabilitation Center (RARC), an in-house residential and rehabilitation center for men with substance abuse problems. Pl. Fact # 82. The following facts about SA and RARC are pertinent:

- SA is an international, non-profit, religious, charitable organization, and has been recognized, for all purposes, as a church. Higgins Aff. ¶ 2.[2] Its mission statement is as follows:

The Salvation Army, an international movement, is an evangelical part of the universal Christian church.

Its message is based on the Bible. Its ministry is motivated by the love of God. Its mission is to preach the gospel of Jesus Christ to meet human needs in His name without discrimination.

Pl. Ex. B.

- SA operates many religious and charitable units, including Harbor Light Centers, Corps Community Centers, senior citizen centers and clubs, camps, children day-care centers, temporary housing, and Adult Rehabilitation Centers (ARCs). Higgins Aff. ¶ 3.

- ARCs constitute the principal means whereby SA practices its religion in the rehabilitation of "spiritually and socially handicapped individuals" through a residential program of religious teaching, counseling, and work therapy. Each ARC is a self-contained religious community with living quarters for residents, known as "beneficiaries," as well as a chapel, a dining room, and a recreation room. The main purpose of ARCs is to "provide spiritual, social and emotional assistance to men and women who have lost the ability to cope with their problems and provide for themselves." SA Ex. C. The main purpose of ARCs is not to prepare its beneficiaries to pursue a technical, skilled, or semiskilled occupation or trade; ARCs offer no degree or other certificate programs. Higgins Aff. ¶¶ 9–11. However, RARC offers GED classes. Statement of Material Facts Not In Dispute ¶ 82.

---

**2.** Bramwell E. Higgins is SA's general counsel.

- Potential participants in SA's ARC programs undergo a comprehensive intake interview to ensure the program is a good match. SA Ex. C.
- SA does not compensate individuals who are placed by schools or universities for the purpose of meeting hourly field work requirements for credits. Thus, Plaintiff was an unpaid, volunteer intern at RARC. Likewise, SA received no compensation from WSU for accepting Plaintiff as an intern. Higgins Aff. ¶¶ 12–13.
- According to Higgins, no contract exists between WSU and SA regarding student field work placement, and WSU has no affiliation with SA other than having students placed there to complete their field work. *Id.* ¶ 14. WSU's Field Placement Manual, however, states that "affiliation agreements" between the school and the field placement agency are mandatory: "If an affiliation agreement is declined, students cannot be placed at the agency . . . ." The manual states that such agreements are to include the terms and conditions of the field placement. Pl. Ex. B at 47. The manual repeatedly describes the relationship between WSU and the field placement agency as a "partnership," *id.* at 6–8, and states that field placement sites are committed to "an education function." *Id.* at 15.

Defendant Stefanski was Plaintiff's field supervisor at RARC. Stefanski interviewed Plaintiff and invited her to come on board as a field intern in December 2007. WSU Fact # 59. Stefanski knew that Plaintiff was pregnant at the time of the interview. WSU Fact # 60. On January 7, 2008, Plaintiff's first day as an intern, Stefanski said to Plaintiff: "I see you have a ring on your finger" and asked if she was married. Plaintiff said "no." Pl. Dep. at 314; WSU Facts ## 134–136.[3] The WSU Defendants concede that this exchange took place. Pl. Facts ## 134–136.

Plaintiff testified that after this conversation, in which Stefanski purportedly first learned that Plaintiff was unmarried, things between her and Stefanski "seemed to go south." Pl. Dep. at 315. Subsequently, Stefanski commented to Plaintiff on two or three occasions that men at RARC may find Plaintiff's pregnancy sexually exciting or stimulating; in this vein, Stefanski told Plaintiff to wear looser-fitting clothing and to stop rubbing her stomach. *Id.* at 316–320. In addition, Plaintiff complained that Stefanski rarely assigned meaningful work to Plaintiff, instead leaving her to her own devices to find projects on her own. *Id.* at 329–330.

**3.** Another intern by the name of Amber Bergin, an undergraduate student at WSU's social work program who was not at the time pregnant or unwed, observed Stefanski make these comments to Plaintiff. Bergin Dep. at 72. Bergin testified that Stefanski had "preset ideas and notions about [Plaintiff]" and was "fixated" on asking her personal lifestyle questions that she did not ask others, such as the identity of the persons with whom she lived and her marital status. *Id.* at 66–67, 71–72. Plaintiff was visibly pregnant at the time. *Id.* at 72–73.

Bergin, like Plaintiff, had a disappointing experience as a student-intern at RARC under Stefanski's supervision. Bergin sent an email—which Bergin herself characterized as a "rant"—to her entire student-body class, in which she complained of Stefanski's unprofessionalism and expressed immense disappointment about her experience at RARC. Pl. Ex. L. Later, Bergin further memorialized her thoughts and opinions on WSU's social work program in a single-spaced, nine-page diatribe. Pl. Ex. M. Durack, WSU's director of field placement at the School of Social Work, expressed disappointment in Bergin for sending the email and dubbed her a "rebel yeller." Bergin Dep. at 91–92, 95.

Plaintiff's relationship with Stefanski deteriorated as the semester progressed, prompting a meeting between Premo, Durack, Stefanski, and Plaintiff on January 17, 2008. *See* Pl. Dep. at 160, 307. At the meeting, Plaintiff expressed a desire to switch to another internship and suggested a few alternate placements. *Id.* at 165–166; Pl. Fact # 151. Stefanski also expressed her desire to no longer serve as Plaintiff's field supervisor. Stefanski Dep. at 149; Pl. Fact # 140. Durack memorialized her observations during the January 17 meeting in a memo to Plaintiff's student file. WSU Ex. 18, Durack wrote that attendance and timeliness issues were raised at the meeting, along with Plaintiff "not follow[ing] through on assignments given." *Id.* Conversely, Plaintiff testified that no performance issues were raised, although she admits that her attendance was mentioned. Pl. Dep. at 165. In addition, Stefanski's complaints about Plaintiff's clothing and belly-rubbing were raised at the meeting. Pl. Facts ## 142–143.

Premo was not agreeable to reassignment. Pl. Dep. at 166; Pl. Fact # 152. Premo told Plaintiff to continue working at SA, if Stefanski would allow it; otherwise, Premo informed Plaintiff that she would have to "drop out of the program due to [her] pregnancy." Pl. Dep. at 166; Pl. Fact # 154. The WSU Defendants do not contest this exchange. Pl. Fact # 155. Premo did not explain why she said this to Plaintiff. Pl. Dep. at 167. Plaintiff immediately complained to WSU's Office of Equal Opportunity (OEO) and to the WSU Ombudsman, Vickie Anderson. Pl. Dep. at 171, 195; Pl. Fact # 156. Anderson suggested that Plaintiff wear a lab coat at RARC. Pl. Fact # 157. Stefanski continued to tell Plaintiff to wear looser clothes, that men get "turned on" by pregnant women, and that her pregnancy was sexually exciting and stimulating to the men at RARC. Pl. Fact # 159. Plaintiff continued

to complain to the OEO on a weekly basis. Pl. Fact # 163. Plaintiff also complained to Durack on January 22, 2008, Pl. Fact # 161, which Premo testified was "frustrating." Premo Dep. at 361.

Stefanski agreed to allow Plaintiff to continue her work at SA and, on January 30, 2008, Plaintiff sent an email to Premo saying that "things are a lot better now between [Stefanski] and I." Pl. Ex. O; Pl. Fact # 164. Premo responded: "You have no idea how much that pleases me. I knew I was backing a winner." Pl. Ex. Q; Pl. Fact # 165. About a week earlier, on January 22, 2008, Plaintiff sent Premo an email expressing concern that she may not receive a fair, unbiased evaluation from Stefanski. Pl. Ex. P. For this reason, Plaintiff stated that she would start documenting her activities at SA and send copies to Premo on a weekly basis. *Id.*

At some point, Premo told Plaintiff that she did not want her to complain to Durack about purported discrimination at SA. Pl. Fact # 162.

Sometime after January 2008, Stefanski initiated a series of telephone calls to Premo complaining—in Premo's words—that Plaintiff was: (1) "making cookies in the kitchen," (2) "wearing clothing that would show her undergarments and some of the men [at RARC] were getting stimulated," (3) "parking in [Stefanski's] parking space," (4) using an unauthorized computer, (5) refusing to "learn about the history of" SA, (6) "not being appropriate in her interviewing of the men" at RARC, (7) "gossiping a lot with the other staff," and (8) "rubbing her belly a lot." Premo Dep. at 104–110, 117. Regarding Plaintiff's clothing, Premo and Gary Gillow, SA's director of rehabilitative services and Stefanski's supervisor, both testified that they felt that Plaintiff's attire was appropriate. Pl. Fact # 176. Nonetheless, Premo

asked Plaintiff to wear looser clothing to accommodate Stefanski. Pl. Fact # 177.

Another meeting was held with Plaintiff, Premo, and Stefanski on March 17, 2008. Pl. Dep. 169–170. WSU Fact # 89. Gary Gillow also attended. Pl. Dep. at 168–169; Pl. Fact # 178. At the meeting, Gillow expressed a desire to replace Stefanski as Plaintiff's supervisor, but Premo was not agreeable because Gillow did not possess the requisite educational credentials. Pl. Dep. at 169–170; Pl. Fact # 180. Plaintiff expressed a concern that Stefanski would fail her "based on [her] discriminatory comments and egregious actions," but Premo assured Plaintiff that she (Premo) alone assigned grades. Pl. Dep. at 170; Pl. Fact # 187. Premo told Plaintiff that she had the knowledge to go out and do social work, and that she would not fail her. Pl. Fact # 188. Premo advised Plaintiff to stop rubbing her belly and to buy bigger clothes. Pl. Dep. at 170–171; Pl. Facts ## 183, 185. In addition, Plaintiff expressed her belief at this meeting that she was being discriminated against and mentioned her contacts with OEO. Pl. Fact # 186.

At some point during the semester, Plaintiff was instructed to prepare "biopsychosocial assessments" of clients and "process recordings." WSU Fact # 91. Premo testified that the assessments submitted by Plaintiff "weren't good" and were "too superficial." Premo Dep. 129–130, 140. Premo further testified as to seemingly substantial problems with Plaintiff's performance and abilities in the area of social work. Id. at 129–130, 140, 161–164, 211, 214; Pl. Ex. X. Plaintiff admitted that she did not complete all the required biopsychosocial assessments, but stated that she could not do so because she was not given clients on which to complete such assessments. Pl. Dep. at 186.

On one particular occasion, Plaintiff complained that an employee of SA by the name of Glen Maloney called her a "beached whale" and remarked: "I am sure [your parents] are really proud that they have a daughter that is having a baby out of wedlock," and "If you didn't live in Bloomfield Hills then you would be living in Taylor in a trailer park." Pl. Aff. ¶ 16; Pl. Fact # 189. Plaintiff was "very distraught" over these comments. Pl. Dep. at 380.

On March 24, 2008, Plaintiff gave Stefanski a performance evaluation for Stefanski to complete, in accordance with WSU requirements. Pl. Dep. at 177; Pl. Fact # 194. Shortly thereafter, Stefanski told Plaintiff again to wear looser clothing and remarked: "If you don't do what I say then Carol Premo will fail you." Pl. Aff. ¶ 8; Pl. Fact # 196.

At around this time, Plaintiff and Premo spoke on the phone. Plaintiff again expressed her concern about getting an unbiased evaluation from Stefanski, and Premo told Plaintiff that she was "doing great." Premo Dep. at 353; Pl. Fact # 197. Premo also told Plaintiff that Stefanski had never failed anyone. Pl. Dep. at 176; Pl. Fact # 198.

Stefanski completed the evaluation on April 14, 2008, giving Plaintiff "does not meet" ratings in 53 out of 54 categories, with abysmal comments, concluding:

> Sadly, it is the feeling of the field instructor that this student is sadly lacking in the area of social work. This internship has taught the student nothing of value because she has not applied herself.

Pl. Ex. S; Pl. Facts ## 199–200. Additionally, Stefanski testified during her deposition that Plaintiff's attitude was "poor," that she acted like she would be "better off" interning somewhere else, and appeared "totally disinterested." Stefan-

ski Dep. at 120–122.[4] Gillow, Stefanski's supervisor, took the position that Stefanski's evaluation of Plaintiff was "biased" based on their "interpersonal conflicts." Gillow Aff. ¶ 8; Pl. Fact # 253.

Plaintiff attacks Stefanski's evaluation of her on several fronts, complaining that it should have had a: (1) "learning plan" attached to it, (2) written comment associated with each and every "does not meet" mark, and (3) description of all assignments and field experiences. The WSU Defendants admit that the evaluation was deficient in these regards. Pl. Facts ## 204–208. Plaintiff also makes much of the fact that she was not made aware of any performance concerns prior to receiving the negative evaluation. Pl. Dep. at 184; Pl. Facts ## 190–191. However, as explained above, attendance and timeliness issues were brought to Plaintiff's attention at the January 17, 2008 meeting, along with Plaintiff's clothing issue and belly-rubbing. Pl. Dep. at 165; Pl. Facts ## 142–143. Some of these issues were discussed again at the March 17, 2008 meeting. Pl. Dep. at 170–171; Pl. Facts ## 183, 185.

After Plaintiff became aware of Stefanski's evaluation, on April 15, 2008, Plaintiff emailed Premo, stating that she had received a failing review from Stefanski, that she felt she had been discriminated against, and that she was "livid." Pl. Ex. T; Pl. Fact # 210. Plaintiff wrote a substantive rebuttal to Stefanski's evaluation, contesting each aspect of it. Pl. Ex. U; Pl. Fact # 217.

In a letter dated April 25, 2008, Premo informed Plaintiff that she had failed her field placement, which meant, per WSU policy, Plaintiff would be terminated from the MSW program.[5] The letter explains Premo's reasons for issuing the failing grade. In short, Premo concluded that Plaintiff (1) did not complete assignments, (2) inappropriately fraternized with staff and clients, (3) did not maintain proper attendance, (4) did not cooperate with Stefanski, (5) was resistant to learning about the social work practice, skills, and ethics, (6) was resistant to constructive criticism, and (7) failed to wear looser clothing when asked by Stefanski. Pl. Ex. X; Pl. Facts ## 221–222. Plaintiff admits that some of these matters were raised during the semester, but maintains that most of them were not, and that she was sandbagged by the evaluation. Pl. Facts ## 223, 225.

Premo testified that she did not rely on Stefanski's evaluation "an awful lot" in evaluating Plaintiff's performance at SA, Premo Dep. at 246; however, Premo did admit that she "count[s] the evaluation." *Id.* at 254.

On April 29, 2008, Plaintiff filed a complaint with OEO charging pregnancy discrimination against Stefanski. Pl. Ex. W; Pl. Fact # 220. The complaint is discussed in more detail below.

On May 1, 2008, Plaintiff called Durack regarding the evaluation. Pl. Fact # 230. When Premo found out that Plaintiff had contacted Durack, she angrily reminded Plaintiff not to call Durack and stated: "You are in deep trouble with me and I am not changing your grade." Pl. Fact # 231. The WSU Defendants admit that this exchange occurred, *id.*, however, Premo testified that she does not remember saying this to Plaintiff, and that the "deep trou-

---

**4.** WSU admits that Stefanski's evaluation of Plaintiff was the worst evaluation any WSU social worker student has ever received. Pl. Fact # 202.

**5.** Premo testified that in her ten years as a faculty adviser (600+ students advised), she has "probably" not failed anyone except Plaintiff. Premo Dep. at 61–62; Pl. Fact # 238.

ble" comment does not sound like something she would say. Premo Dep. at 337. Premo further testified that it was "not appropriate" for a student to call Durack because the Director of Field Education "does not want to be called by all the students." *Id.*

WSU's Field Education Manuel states that a student having issues with her field instructor is "free to consult" the Director of Field Education, who was Durack at all pertinent times. Pl. Ex. B at 61. In fact, the Manuel actually requires students to report "inappropriate behavior" to the Director of Field Education. *Id.* at 22.

On May 2, 2008, Phyllis Vroom, Dean of WSU's School of Social Work, sent Plaintiff a letter officially terminating her from the program. Pl. Ex. Y. On May 16, 2008, Plaintiff appealed her grade to Vroom. Pl. Ex. CC; Pl. Facts ## 258–259. On July 21, 2008, Premo sent Vroom an email urging her to deny Plaintiff's grade appeal. Pl. Ex. FF; Pl. Fact # 266. On August 5, 2008, Vroom denied the appeal, concluding that the unsatisfactory grade "was awarded ... as a result of your poor performance throughout the course." Pl. Ex. GG; Pl. Fact # 270. Vroom had never met, or had a conversation with, Plaintiff. Pl. Fact # 271. On September 9, 2008, Plaintiff appealed Vroom's decision to the Office of the Provost. Pl. Ex. HH. On December 17, 2008, the Provost denied Plaintiff's appeal, stating that Vroom had correctly followed WSU's grade appeal procedures. WSU Ex. 40; Pl. Fact # 272.

Meanwhile, on August 26, 2008, Plaintiff requested reinstatement to the School of Social Work. Pl. Ex. II; Pl. Fact # 273. A three-member committee consisting of WSU faculty members—Defendants Shawna Lee, Antonio Gonzalez—Prendes, and Margaret Brunhofer—was convened to review the request. Pl. Ex. KK; Pl. Facts ## 274–277.[6] Lee chaired the committee. Pl. Fact. # 280. The committee voted unanimously to recommend denial of reinstatement, finding no extenuating circumstances.[7] The committee noted that Plaintiff did not accept responsibility for actions that led to her termination, and that Plaintiff had not demonstrated changed circumstances or a plan for remediation. *Id.* Lee does not recall any mention of Plaintiff's marital status at the time the committee made its recommendation. Lee Dep. at 52. The WSU Defendants admit that Plaintiff had no input with respect to what documents were considered by the committee, but points out that Plaintiff had control over the content of her request for reinstatement. Pl. Fact # 283. On September 24, 2008, Vroom accepted the committee's recommendation. Pl. Ex. LL.[8] Vroom admitted that the School of Social Work has reinstated students in the past who have failed numerous classes *and* received an unsatisfactory mark in field work. Vroom Dep. at 251; Pl. Fact # 324.

As referenced above, Plaintiff filed a complaint with the OEO on April 29, 2008. Pl. Ex. W; Pl. Fact # 220. The OEO

---

**6.** Brunhofer had been WSU's MSW program coordinator for eight years, had Plaintiff as a student, and had served on at least 50 reinstatement committees over the previous 20 years. Brunhofer Dep. 8–9, 13–14. Prendes had sat on about 10 reinstatement panels in the previous 10 years. Prendes Dep. at 14–15. The record does not contain evidence regarding Lee's previous experience serving on reinstatement panels.

**7.** The three criteria for reinstatement are: (1) documentation of extenuating circumstances, (2) whether the student accepted responsibility, and (3) a plan to remediate the situation moving forward. Pl. Facts ## 286 287.

**8.** Plaintiff complains extensively about the way the reinstatement process operates, in general, and about how it operated specifically in her case. Pl. Facts ## 288–303.

contacted Durack, Durack Dep. at 327, 329; WSU Fact # 108, who then sent the OEO information pertaining to Plaintiff's situation. WSU Ex. 27. On May 13, 2008, the OEO sent Plaintiff a letter stating that (1) it did not have jurisdiction over her complaint because Stefanski was not an employee of WSU, (2) it had referred the matter to the School of Social Work, and (3) "[a]fter a thorough analysis of all the information ... obtained, there is insufficient evidence of pregnancy discrimination or other improper actions that would allow [OEO] to initiate a formal investigation." WSU Ex. 28; Pl. Fact # 243. Despite the letter's reference to a "thorough analysis," OEO's Director admitted later that his office had not conducted any investigation. Pl. Fact # 245.

Prior to her service as a field intern with VA and SA, Plaintiff's worked at a Dearborn, Michigan-based social services agency called Vista Maria, where Plaintiff was promised a social worker job upon completion of her MSW degree. Pl. Dep. at 48, 51–52.

## III. SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When evaluating a summary judgment motion,

credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). Thus, the facts and any inferences that can be drawn from those facts must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

*Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 373 (6th Cir.2009) (quotation marks and brackets omitted).

## IV. ANALYSIS

### A. SA's Motion for Summary Judgment

Plaintiff asserts Title IX and ELCRA pregnancy and marital-status discrimination claims against SA, along with retaliation claims (Counts I, II, IV, and V). SA argues that it is entitled to summary judgment as to all claims filed against it because it is not an educational institution, or an agent of an educational institution, and because neither Plaintiff nor SA is covered by the ELCRA. Plaintiff disagrees with SA on all points.

### 1. Discrimination by Educational Institutions

Under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, with certain exceptions not applicable here,

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ...

20 U.S.C. § 1681.[9] Michigan law contains a similar provision. *See* Mich. Comp. Laws § 37.2402 ("An educational institu-

---

9. Retaliation is a form of discrimination and is covered under § 1681, as well. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005) ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action.").

tion shall not ... [d]iscriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of ... sex."). The Supreme Court has stated that Title IX applies only to "educational institutions." *See Cannon v. Univ. of Chicago,* 441 U.S. 677, 695 n. 17, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("Title IX is applicable only to certain educational institutions receiving federal financial assistance ..."). "Educational institution" is defined, in relevant part, as "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education ..." 20 U.S.C. § 1681(c). SA argues that it does not fit this definition, and the Court agrees.

■ RARC is obviously not a preschool, an elementary school, a secondary school, or an institution of higher education. This leaves only an institution of vocational or professional education as possibilities, and RARC is neither. *See* 34 C.F.R. § 106.2(n) (defining an institution of professional education as an institution offering "a program of academic study that leads to a first professional degree in a field for which there is a national specialized accrediting agency recognized by the Secretary [of Education]"); 34 C.F.R. § 106.2(*o* ) (defining an institution of vocational education as "a school or institution ... which has as its primary purpose preparation of students to pursue a technical, skilled, or semiskilled occupation or trade, or to pursue study in a technical field ..."). Although RARC offers GED classes to certain of its beneficiaries, Plaintiff presents no evidence that it offers "a program of academic study that leads to a first professional degree," and its "primary purpose" is certainly not to provide education, but rather—as the name "Adult Rehabilitation Center" implies—to provide

rehabilitation services for adults with substance abuse problems.

Plaintiff also argues, without citation to any authority and without further explanation, that RARC qualifies as an educational institution through its "longstanding partnership" with WSU's School of Social Work. This argument is undermined by the Second Circuit's persuasive and well-reasoned decision in *O'Connor v. Davis,* 126 F.3d 112 (2d Cir.1997), a materially indistinguishable case discussed extensively in SA's motion but not mentioned by Plaintiff in her response brief.

The plaintiff in *O'Connor* was a social work student who was placed at the defendant-hospital, as an unpaid student volunteer, to fulfill her academic field work requirement. *Id.* at 113. The plaintiff brought a Title IX claim against the hospital after purportedly being sexually harassed by one of its doctors. *Id.* at 113–114. The district court dismissed the claim, holding that the hospital was not transformed into an educational institution, for Title IX purposes, by permitting a student to perform volunteer field work at its facility. *Id.* at 114. After extensive analysis and discussion, the Second Circuit reached the same conclusion, writing: "We decline ... to convert [the hospital's] willingness to accept volunteers into conduct analogous to administering an 'education program' as contemplated by Title IX." *Id.* at 118. In addition, the court refused to impute "the fact that [Plaintiff's university] operates an 'education program' ... to [the hospital] simply because [the plaintiff] was a student at the former while she performed volunteer work with the latter," because

the two entities have no institutional affiliation; there is no written agreement binding the two entities in any way; no staff are shared; no funds are circulated between them; and, indeed, [university]

students had previously volunteered at [the hospital] on only a few occasions.

*Id.*

As *O'Connor* is nearly indistinguishable from the present case, it compellingly counsels against a finding that RARC is an educational institution for Title IX purposes.[10] RARC is not an educational institution and, therefore, Title IX does not apply.[11]

■ In a similar vein, Plaintiff argues that SA is liable under Title IX and the ELCRA as an "agent" of WSU. The Court does not find the argument persuasive. Plaintiff offers no authority for the proposition that Title IX applies to "agents" of educational institutions. Thus, the Court

rejects Plaintiff's attempt to hold SA liable under Title IX on an agency theory.[12]

■ Unlike Title IX, Michigan's counterpart—the ELCRA—expressly covers agents of educational institutions. *See* Mich. Comp. Laws § 37.2401. Thus, if a reasonable jury could find that SA was acting as an agent of WSU, Plaintiff's ELCRA claim against SA must proceed.

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006).[13] Taking the facts in the light most

10. *O'Connor* and the present case differ slightly in two respects. First, it would appear that WSU students have been placed at RARC on more than a mere "few occasions" over the years. Second, WSU's Field Placement Manual provides for mandatory "affiliation agreements" between the school and the field placement agencies. However, it is uncontested that, in reality, no such agreement exists between WSU and RARC or SA. Although these differences render *O'Connor* marginally distinguishable from the present case, the Court nonetheless believes that *O'Connor* is highly persuasive. This is especially true because the significant factors present in *O'Connor* are present here (*i.e.,* no written contract between the school and field placement agency, no shared staff, no exchange of funds).

11. Because RARC is not an educational institution, the Court does not address the alternative argument that SA is a recipient of federal funding.

12. Notwithstanding the lack of authority offered by Plaintiff, the Court's independent research uncovered no case supportive of Plaintiff's position, but did locate cases stating that only educational institutions can be sued under Title IX. *See, e.g., Lillard v. Shelby Cnty. Bd. of Educ.,* 76 F.3d 716, 730 (6th Cir.1996) (Nelson, J., concurring) ("I do not believe that Title IX can appropriately be read as subjecting anyone other than educational institutions

to liability for violation of its terms."); *Smith v. Metro. Sch. Dist. Perry Twp.,* 128 F.3d 1014, 1019 (7th Cir.1997), *cert. denied,* 524 U.S. 951, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998) (collecting cases supporting the proposition that Title IX allows suits only against educational institutions). Although Title IX and Title VII claims are often analyzed under the same or similar legal framework, the statutory text of Title VII expressly covers agents while the same is not true of Title IX, an omission indicative of Congressional intent to place agents of educational institutions outside the scope of Title IX's ambit. *See, e.g., Bustos v. Ill. Institute of Cosmetology, Inc.,* No. 93–5980, 1994 WL 710830 (N.D.Ill. Dec. 15, 1994) ("Title VII prohibits discrimination by employers and their agents while Title IX prohibits discrimination by educational institutions which receive federal financial assistance.... In contrast [to Title VII], Title IX contains no separate references to agents of educational institutions.").

13. The Restatement of Agency is routinely utilized by Michigan courts, *see, e.g., Goldman v. Cohen,* 422 Mich. 865, 365 N.W.2d 754, 756 (1985); *Meretta v. Peach,* 195 Mich.App. 695, 491 N.W.2d 278, 280 (1992), and federal courts, as well. *See, e.g., United States v. Aldridge,* 642 F.3d 537, 541 (7th Cir.2011); *JSG Trading Corp. v. Dep't of Agric.,* 235 F.3d 608, 616 (D.C.Cir.2011); *United States v. Bonds,* 608 F.3d 495, 514 (9th Cir.2010).

favorable to Plaintiff, the Court concludes that no reasonable jury could find an agency relationship between WSU and SA on the present record, because there is no evidence supporting the crucial elements of an agency relationship. In particular, there is no evidence from which a reasonable jury could conclude that: (a) SA owed a special or fiduciary duty to WSU, *see In re Susser Estate,* 254 Mich.App. 232, 657 N.W.2d 147, 150 (2002) (quoting Restatement (Second) of Agency § 13 cmt. a (1958) for the proposition that "[t]he agreement to act on behalf of the principal causes the agent to be a fiduciary, that is, a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking."); (b) SA was authorized to conduct business on WSU's behalf, *see Meretta v. Peach,* 195 Mich.App. 695, 491 N.W.2d 278, 280 (1992) ("An agency relationship may arise when there is a manifestation by the principal that the agent may act on his account."); or (c) WSU controlled SA, *see St. Clair Intermediate Sch. Dist. v. Intermediate Educ. Ass'n/ Mich. Educ. Ass'n,* 458 Mich. 540, 581 N.W.2d 707, 716 n. 18 (1998) ("[A]n agency relationship arises only where the principal has the right to control the conduct of the agent with respect to matters entrusted to him.") (citation and internal quotation marks omitted).

Plaintiff contends that several facts support her argument that an agency relationship exists between WSU and SA. First, Plaintiff points out that the two entities claimed to work "in concert" or in "partnership," and generally collaborated on issues related to the supervision of interns. These facts, however, in no way support a

finding of agency because they are not probative of the crucial elements of an agency relationship, as outlined above. They do not evidence any special duty, authority to act on behalf of WSU, or control by WSU.[14]

Second, Plaintiff contends that certain testimony in the record establishes the element of control by WSU. Plaintiff notes that Premo testified that she "closely supervised" Stefanski, *see* Premo Dep. at 77–78, and that Durack "admitted" that she was "in charge" of both field placements and field instructors. *See* Durack Dep. at 66–67. However, the Court concludes that these terse snippets of testimony fail to raise an issue of fact supporting an agency finding.

■ Under Michigan law, to establish control, it must be shown that the alleged principal controls specific conduct of the alleged agent. *St. Clair Intermediate Sch. Dist.,* 581 N.W.2d at 716 ("[F]undamental to the existence of an agency relationship is the right to control the conduct of the agent ... with respect to matters entrusted to him.") (citation omitted). *See also Little v. Howard Johnson Co.,* 183 Mich. App. 675, 455 N.W.2d 390, 393 (1990) (upholding grant of summary disposition to franchisor resulting in no liability for injury to plaintiff on franchisee's property, where franchisor did not control the "day-to-day operations" of the franchisee's business). Mere "general oversight" does not suffice. *Id.* Plaintiff fails to identify even one specific act of control whereby Stefanski was ordered or directed by WSU to do anything. Conclusory and non-specific testimony that Premo "closely supervised"

---

**14.** Even use of the term "partnership," a term that in other contexts might denote special duties, is, in the present context, a colloquial equivalent for a common effort. It was clearly not meant to denote a legal relationship with special duties, given that a legal partnership requires an intent "to carry on as co-owners a business for profit," Mich. Comp. Laws § 449.6(1), and no such intent has been shown here.

Stefanski and that Durack was "in charge of field instructors" is, at best, "general oversight," which is not sufficient under Michigan law.

Notably, WSU could not control SA or Stefanski with regard to the specific action complained of in this case, namely, Stefanski's allegedly discriminatory evaluation of Plaintiff. As Plaintiff's field instructor charged specifically with the task of evaluating Plaintiff's performance as a field intern, Stefanski had full discretion to evaluate Plaintiff without any input from—or control by—WSU and its administration. This fact seals the fate of Plaintiff's agency argument under Michigan law. *See Meredith v. Oakwood Healthcare, Inc.*, No. 288507, 2010 WL 1404426, at *2 (Mich.Ct. App. Apr. 8, 2010) ("Because the record lacks any evidence to demonstrate that [the purported principal] had the right to control [the purported agent] when [the purported agent] committed the allegedly negligent act, a jury would be precluded from finding [the purported principal] liable pursuant to a theory of actual agency.")

In sum, no reasonable jury could find that SA could, or did, act on behalf of WSU; that it owed WSU any duty, much less a duty even remotely approximating a fiduciary duty; or that WSU controlled the conduct of Stefanski or others at SA through Premo and/or Durack. For all these reasons, the Court concludes that, as a matter of law, Plaintiff cannot establish an agency relationship between WSU and SA, and Plaintiff's ELCRA claim against SA fails.

## 2. Discrimination in Employment and Place of Public Accommodation/Public Service

The ELCRA "prohibits discrimination because of sex in employment, places of public accommodation, and public services." *Hamed v. Wayne County*, 490 Mich. 1, 803 N.W.2d 237, 243 (2011). *See* Mich. Comp. Laws §§ 37.2202(1)(a) (employment); 37.2302 (public accommodation and public services). Plaintiff alleges that she was discriminated against in a place of employment and in a place of public accommodation/public service. The Court addresses each claim, in turn.

### a. Discrimination in a Place of Employment

Under the ELCRA, "[a]n employer shall not ... discharge ... an individual ... because of ... sex ... or marital status." Mich. Comp. Laws § 37.2202(1)(a). SA argues that because Plaintiff was an unpaid intern, she is not an employee under the ELCRA and, thus, Plaintiff's ELCRA claim under § 37.2202 is not viable as a matter of law.

■■■ The so-called "economic reality test" is used to determine whether an employment relationship exists for purposes of the ELCRA.[15] *Ashker v. Ford Motor Co.*, 245 Mich.App. 9, 627 N.W.2d 1, 3 (2001). The factors to be considered are: (1) control of a worker's duties; (2) payment of wages; (3) right to hire, fire, and discipline; and (4) performance of the duties as an integral part of the employer's business toward the accomplishment of a common goal. *Chilingirian v. City of Fra-*

---

**15.** SA urges the Court to apply the federal-law rule that an employer-employee relationship cannot exist under Title VII without remuneration. Although this is true in some circuits, *see, e.g., United States v. City of New York*, 359 F.3d 83 (2d Cir.2004); *Evans v. Washington Ctr. for Internships & Academic Seminars*, 587 F.Supp.2d 148, 151 (D.D.C.2008), it is not true in the Sixth Circuit. *See Bryson v. Middlefield Volunteer Fire Dep't, Inc.*, 656 F.3d 348, 353 (6th Cir.2011) (rejecting notion that "remuneration must be an independent antecedent inquiry" in favor of an "all of the incidents of the relationship" test). In any event, Michigan law—not federal law—controls Plaintiff's ELCRA claim.

*ser*, 194 Mich.App. 65, 486 N.W.2d 347, 349 (1992). The test considers the totality of the circumstances surrounding the work performed and no single factor is controlling. *Id.*

The Court finds that the four *Chilingirian* factors tip against finding that Plaintiff was an employee of RARC. Regarding the first factor—control of a worker's duties—the record as a whole reflects that Plaintiff received her day-to-day assignments from Stefanski, and not from WSU. Thus, this factor weighs in favor of Plaintiff.

Regarding the second factor—payment of wages—Plaintiff was not compensated for her work with SA, nor does the evidence suggest that she received significant remuneration of any kind, such as insurance, retirement, or disability benefits, or the like. She was an unpaid volunteer. Thus, this factor weighs in favor of SA, a fact that Plaintiff admits.[16]

Regarding the third factor—right to hire, fire, and discipline—the parties do not direct the Court to evidence on the question of whether Stefanski or anyone at SA had the authority to hire, fire, or discipline Plaintiff and, in fact, the parties scarcely discuss this element of the *Chilingirian* framework. On the one hand, the record suggests that Stefanski had at least some control over Plaintiff's fate as an intern at RARC. Indeed, when Plaintiff expressed a desire to complete her internship at another agency, Premo told Plaintiff to continue to work at SA, *provided* Stefanski would allow it. Pl. Dep. at 166. In addition, the record reflects that Plaintiff interviewed with Stefanski, who—in Premo's words—gave the "green light" for Plaintiff to begin working at SA. Premo

Dep. at 103–104. These facts suggest that Stefanski had some control over Plaintiff's status at RARC.

On the other hand, the record is also clear that Premo was the individual with the *most* control over Plaintiff's involvement and status at RARC. The following facts illustrate the point:

- Only Premo—and not Stefanski or anyone else at SA—had the authority to award Plaintiff her final grade. Premo Dep. at 181. Thus, Plaintiff's ultimate fate lay in the hands of WSU and not SA.
- Plaintiff testified that Premo told her that Stefanski "had to accept" her and "could not decline" her for an internship at RARC. Pl. Dep. at 152.
- Stefanski testified that she does not report to anyone at SA about the progress of WSU interns; rather, she reports only to WSU faculty. Stefanski Dep. at 40.
- WSU set the number of hours required for the field placement, thereby controlling a central tern of Plaintiff's experience at RARC. Pl. Dep. 275–277.

All in all, this element of the *Chilingirian* framework does not weigh strongly in favor of either party, as certain facts weigh in favor of Plaintiff, while others weigh in favor of SA.

The final factor is whether Plaintiff's performance duties were an integral part of the employer's business toward the accomplishment of a common goal. Stefanski testified that RARC has one to six interns working for it at any given time, but that the number does not fluctuate based on beneficiary enrollment. Stefanski Aff. ¶ 3. According to Stefanski, RARC

---

**16.** Plaintiff states that she was paid in the form of practical social work experience. This is clearly not "the payment of wages," nor does it qualify as remuneration for the purposes of the economic reality test.

"is able to function and fully provide services to [its] beneficiaries without the use of any student interns." *Id.* ¶ 4. This testimony strongly supports SA's view that student interns such as Plaintiff are not "integral" to the operation of RARC, and the record as a whole suggests that the internship was for Plaintiff's benefit and not the benefit of RARC. In addition, Plaintiff admits that she only met with two SA beneficiaries during her internship for one hour each per week. Plaintiff's contribution of two hours of counseling per week, for a temporary period, does not render Plaintiff's assistance "integral" to the accomplishment of RARC's common goal of rehabilitating its beneficiaries. Thus, this factor weighs in favor of SA.

Having balanced the *Chilingirian* factors, the Court concludes that Plaintiff was not an employee of RARC for ELCRA purposes. Key factors—including lack of remuneration, the absence of effective control by SA over Plaintiff's fate, and the non-essentiality of Plaintiff's work to SA's mission—demonstrate that Plaintiff was not an SA employee. Accordingly, summary judgment must be granted in favor of SA on Plaintiff's ELCRA claim under § 37.2202.

**b. Discrimination in a Place of Public Accommodation/Public Service**

■■ Plaintiff argues that, even if SA did not employ her, it is liable because the ELCRA also prohibits discrimination in places of public accommodation/public ser-

vice. *See* Mich. Comp. Laws § 37.2302. Under § 37.2302, "a person shall not ... [d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of ... sex ... or marital status." To state a claim under § 37.2302(a), Plaintiff must establish four elements: (1) discrimination based on a protected characteristic (2) by a person, (3) resulting in the denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations (4) of a place of public accommodation. *Haynes v. Neshewat*, 477 Mich. 29, 729 N.W.2d 488, 492 (2007). The parties disagree about the fourth element of the *Haynes* framework, i.e., whether RARC is a place of public accommodation.[17]

A "place of public accommodation" is defined as follows:

(a) "Place of public accommodation" means a business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public. Place of public accommodation also includes the facilities of the following private clubs:

(i) A country club or golf club.

---

17. SA also argues that Plaintiff's § 37.2302 claim fails because she was not denied "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations," as required under the third element of the *Haynes* framework. The argument is unpersuasive in light of the *Haynes* decision itself. There, the Michigan Supreme Court held that the public accommodation provision of the ELCRA prohibits unlawful discrimination against any individual in a place of public accommodation, not just against members of the public. In other words, the public accommodation provision applies even when the "goods, services, facilities, privileges, advantages, or accommodations" to which the plaintiff was denied access are not offered to the public. *Id.* at 493–494. Thus, SA's argument that the public accommodation provision does not apply—on the theory that Plaintiff was not a member of the public seeking to utilize SA's services—is without merit.

(ii) A boating or yachting club.

(iii) A sports or athletic club.

(iv) A dining club, except a dining club that in good faith limits its membership to the members of a particular religion for the purpose of furthering the teachings or principles of that religion and not for the purpose of excluding individuals of a particular gender, race, or color.

Mich. Comp. Laws § 37.2301(a).

■ RARC does not come within the statutory definition of a place of public accommodation. As an initial matter, it is beyond dispute that SA is a private organization. Its mission statement reflects that it "is an evangelical part of the universal Christian church," and that "[i]ts mission is to preach the gospel of Jesus Christ ..." Pl. Ex. RR. Moreover, the following portion of SA's website unequivocally demonstrates that RARC is selective of its membership, and that its services are not available to members of the public:

Rehabilitative Program

The Salvation Army's Adult Rehabilitation Centers provide spiritual, social and emotional assistance for men and women who have lost the ability to cope with their problems and provide for themselves.

Each center offers residential housing, work, and group and individual therapy, all in a clean, wholesome environment. The physical and spiritual care that program participants receive prepares them to re-enter society and return to gainful employment. Many of those who have been rehabilitated are reunited with their families and resume a normal life.

Who Is Eligible?

*Every potential participant undergoes a comprehensive intake interview to ensure the ARC program is the best possible match for them.* If the interview process determines it's not, we'll make every effort to refer them to a program that will be.

SA Ex. C (emphasis added). This evidence demonstrates that the RARC program is made available only to those who successfully complete a significant screening process. Plaintiff offers no convincing evidence rebutting SA's evidence demonstrating that RARC's services are not open to the public.[18] Accordingly, RARC is not a "place of public accommodation," as defined by § 37.2301(a). Nor is RARC a "public service" for the reasons set forth in the margin.[19]

---

**18.** Plaintiff quotes the following excerpt from SA's website in support of her position that RARC is open to the public: "The Adult Rehabilitation Center ministry began in 1881 when William Booth, founder of the Salvation Army, opened shelters for homeless people on the streets of England and this initiative quickly spread to the United States." Pl. Resp. at Ex. RR. This excerpt discusses the roots of SA's rehabilitation centers; it is not probative on the issue of whether RARC is open to the public. Because potential RARC participants undergo a substantial screening and interview process to ensure a "match," the Court cannot conclude that RARC is "open to the public."

**19.** Plaintiff also argues that RARC is a "public service." That term is defined as follows: "Public service" means a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof or a tax exempt private agency established to provide service to the public, except that public service does not include a state or county correctional facility with respect to actions and decisions regarding an individual serving a sentence of imprisonment.

Mich. Comp. Laws § 37.2301(b). RARC is clearly not "a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision." Nor does RARC "pro-

Nor is there any liability by way of § 37.2303.[20] That provision creates a general exemption, under which private clubs and establishments not "open to the public" are not subject to liability under § 37.2301(a). It also creates an exception from that general exemption, under which private clubs and establishments not open to the public are, nonetheless, liable under § 37.2301(a) if their "the goods, services, facilities, privileges, advantages, or accommodations ... are made available to the customers or patrons of another establishment that is a place of public accommodation." Here, there is no evidence that RARC offers its services to anyone other than those individuals who are accepted into the program after the "comprehensive intake interview," referenced above. Thus, the exception is not applicable, nor does any other language contained in that section subject SA to ELCRA liability.[21] For all these reasons, RARC is not a place of public accommodation, and SA is not subject to liability as such.

In support of her position that RARC is a place of public accommodation, Plaintiff relies on *Rogers v. International Association of Lions Clubs*, 636 F.Supp. 1476 (E.D.Mich.1986); however, *Rogers* is dis-tinguishable. The defendant organization in *Rogers* was held to be a place of public accommodation because it selected its members with only "perfunctory scrutiny" and its meetings were held in public places, such as restaurants, with attendance open to even nonmembers. *Id.* at 1479–1480. In essence, anyone who desired membership was accepted. The opposite is true in the present case; here, the record evidence is uncontroverted that the intake process involves a "comprehensive ... interview to ensure the ARC program is the best possible match for them."

The present case is more analogous to *Doe v. Young Marines of the Marine Corps League*, 277 Mich.App. 391, 745 N.W.2d 168 (2007). There, the plaintiff brought a sexual harassment claim under the ELCRA's public-accommodation provision against the Young Marines, "a private, non-profit corporation run by volunteers whose purpose is to promote the mental, moral and physical development of its members, who are ages eight through high school." 745 N.W.2d at 169. The Court of Appeals held that the Young Marines was not a place of public accommodation, and therefore not subject to liability

---

vide service to the public" because, as discussed above, access to its services is significantly restricted.

**20.** Section 37.2303 reads as follows:
This article shall not apply to a private club, or other establishment not in fact open to the public, except to the extent that the goods, services, facilities, privileges, advantages, or accommodations of the private club or establishment are made available to the customers or patrons of another establishment that is a place of public accommodation or is licensed by the state under Act No. 8 of the Public Acts of the extra session of 1933, being sections 436.1 through 436.58 of the Michigan Compiled Laws. This section shall not apply to a private club that is otherwise defined as a place of public accommodation in this article.

**21.** Other language in the § 37.2303 creates an exception from the general exemption that the ELCRA does not apply to private clubs or establishments not open to the public if the establishment is licensed under certain liquor control provisions; however, the repeal of those liquor control provisions makes that exception inapplicable. Also inapplicable is the last sentence of § 37.2303, which clarifies that certain types of clubs specifically listed at Mich. Comp. Laws § 37.2301(a)(i)-(iv) (*i.e.*, country, sporting and certain dining clubs) retain their status as "place[s] of public accommodation." RARC, however, does not qualify as one of the listed types of private clubs. Therefore, nothing in § 37.2303 makes SA subject to the ELCRA.

under § 37.2301(a), because it was a private club whose services were not made available to anyone other than its members. The same can be said about RARC.

In sum, SA is neither an employer of Plaintiff, nor a place of accommodation within the meaning of the ELCRA.[22] Therefore, summary judgment in favor of SA must be granted as to Plaintiff's claims under the ELCRA.

### B. Stefanski's Motion for Summary Judgment

Plaintiff asserts ELCRA discrimination and retaliation (but no Title IX claims) against Defendant Stefanski, along with claims for tortious interference with a contractual relationship and tortious interference with a business relationship or expectancy (Counts IV, V, and VI). Stefanski argues that she is entitled to summary judgment on the ELCRA claims for the same reasons asserted by SA, discussed above. Because the Court has already determined that Plaintiff was not an employee of RARC for ELCRA purposes, and that RARC is not a place of public accommodation or public service, the Court will grant summary judgment in favor of Stefanski on Plaintiff's ELCRA claims.

Plaintiff also asserts claims against Stefanski for tortious interference with a contract and tortious interference with a business expectancy. Plaintiff's theory on the contract claim is that Plaintiff and WSU's MSW program. With regard to the business expectancy claim, Plaintiff alleges that Stefanski interfered with Plaintiff's

relationship with a prospective employer—Vista Maria—in the same way.

■ The elements of tortious interference with a contract are: (1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant. *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich.App. 300, 486 N.W.2d 351, 358 (1992). Stefanski argues that summary judgment should be granted in her favor because (1) Plaintiff cannot establish causation, *i.e.*, Stefanski's review did not directly lead to Plaintiff's purported damages, as WSU exercised its own independent judgment in awarding Plaintiff her failing grade, (2) Stefanski's evaluation of Plaintiff is protected by absolute or qualified privilege, and (3) the relationship between Plaintiff and WSU relative to the dismissal process is not contractual in nature under Michigan law.

■ The Court agrees with Stefanski that Plaintiff's claim for tortious interference with a contract is not viable because Michigan courts do not recognize an express or implied contract between student and university relative to the evaluation and dismissal process. To sustain her claim, Plaintiff must show—among other things—the existence of a contract between her and WSU and a breach thereof. *See Admiral*, 486 N.W.2d at 358. On the one hand, Plaintiff argues that Michigan courts recognize an implied contract between university and student relative to dismissal.[23] In support, Plaintiff cites *Carlton v. Trustees of University of De-*

---

**22.** Plaintiff offers an alternative basis for applying the ELCRA's public accommodation provision to SA. Specifically, Plaintiff argues that SA is liable under § 37.2301(a) as WSU's agent. As Plaintiff correctly notes, "educational institution" under the ELCRA also "includes an agent of an educational institution." Mich. Comp. Laws § 37.2401. However, the Court has already determined there to

be no genuine issue of material fact as to the existence of an agency relationship between WSU and SA. Therefore, Plaintiff's agency theory fails.

**23.** Plaintiff does not argue that her relationship with WSU is governed by an express contract.

*troit Mercy,* No. 225926, 2002 WL 533885 (Mich.Ct.App. Apr. 2, 2002). Stefanski, on the other hand, relying on a number of cases, argues that Michigan law does not recognize an implied contract between student and university relative to the dismissal process.

In *Woodward v. Trinity Health–Michigan,* No. 292172, 2011 WL 118812, at *3 (Mich.Ct.App. Jan. 13, 2011), the Michigan Court of Appeals flatly held that there is no implied contract between a university and its students relative to evaluation and dismissal for the purposes of a tortious interference claim. The plaintiff in *Woodward* was a medical student completing his clinical rotation at the defendant-hospital. *Id.* at *1. Hospital staff submitted an unflattering evaluation to the student's school, prompting the school to initiate proceedings to dismiss the student from the school. *Id.* The student brought a tortious inference with a contract claim against the hospital for writing the evaluation, asserting that the hospital interfered with an implied contract between himself and his school. *Id.* at **2, 5. The *Woodward* court held that the student's interference claim against the hospital failed because no express or implied contract existed between the student and his university relative to continued enrollment. Thus, the student could not establish the existence of a contract and a breach thereof. *Id.* at **3, 5. *See also Amaya v. Mott Cmty. Coll.,* No. 186755, 1997 WL 33353479, at *1 (Mich.Ct.App. Mar. 7, 1997) ("[S]tate and federal courts [in Michigan] have stated that under Michigan law contract ... claims brought by a student against a college or university fail."). Plaintiff's claim for tortious interference with a contract is barred, given that the above authorities hold that there is no contractual relationship between university and student relative to dismissal.

Plaintiff urges the Court to find an implied contract between her and WSU based the Michigan Court of Appeals' statement in *Carlton,* the sole case on which Plaintiff relies, that an implied contractual right exists between a university and its students "giv[ing] the student the right to continued enrollment free from arbitrary dismissal." 2002 WL 533885, at *3. However, as another judge in this district has recognized, the *Carlton* court did not mean what it said when it characterized a student's due process right to continued enrollment free from arbitrary dismissal as a contract right. *See Zwick v. Regents of Univ. of Mich.,* No. 06–12639, 2008 WL 1902031, at *5 (E.D.Mich. Apr. 28, 2008) (interpreting Michigan law). While acknowledging the *Carlton* court's statement, *Zwick* clarified that the implied contractual right to which the *Carlton* court referred "amounted to 'the right to continued enrollment free from arbitrary dismissal' " under the Due Process Clause of the United States Constitution. Notwithstanding *Carlton,* the *Zwick* court reiterated: "Michigan courts ... do not extend this recognition to construe a contractual relationship between a student and a university." 2008 WL 1902031, at *5 n. 3. Summary judgment is proper in favor of Stefanski on Plaintiff's claim for tortious interference with a contractual relationship.

Plaintiff's claim for tortious interference with a business expectancy fails, as well. The elements of tortious interference with a business relationship or expectancy are: (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy by the interferer, (3) an intentional and wrongful interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy

was disrupted. *P.T. Today, Inc. v. Comm'r of Office of Fin. & Ins. Servs.*, 270 Mich.App. 110, 715 N.W.2d 398, 422 (2006). Plaintiff's theory is that Stefanski's evaluation contributed to Premo's decision to fail her, resulting in Plaintiff's dismissal from the MSW program, which then resulted in Plaintiff losing out on a job promised to her by Vista Maria, the Dearborn-based social services agency where Plaintiff had previously worked. Pl. Dep. at 48.

Stefanski argues that Plaintiff's business expectancy claim fails because (1) Plaintiff cannot establish causation, *i.e.*, Stefanski's review did not directly lead to Plaintiff's purported damages, as WSU exercised its own independent judgment in awarding Plaintiff her failing grade, (2) Stefanski's evaluation of Plaintiff is protected by absolute or qualified privilege, and (3) Plaintiff has not provided evidence demonstrating that Stefanski knew of any particular business expectancy at the time she submitted Plaintiff's evaluation.

The Court finds Stefanski's third argument persuasive; the fatal problem with Plaintiff's claim for tortious interference with a business expectancy is that she has adduced no evidence demonstrating that Stefanski knew of Plaintiff's job opportunity with Vista Maria at the time she submitted her evaluation of Plaintiff. As stated above, "knowledge of the relationship or expectancy by the interferer" is a required element of a claim for tortious interference with a business expectancy. *P.T. Today*, 715 N.W.2d at 422. *See also* Restatement (Second) of Torts § 766 cmt. i (1979) ("To be subject to liability . . . the actor must have knowledge of the contract with which he is interfering. . . . Although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract."). Because

Plaintiff has not established that Stefanski was aware of Plaintiff's expectancy with Vista Maria, her claim for tortious interference with a business expectancy fails.

Plaintiff argued during oral argument that Stefanski's general knowledge that Plaintiff would be deprived of any employment as a social worker is sufficient. Plaintiff has presented no authority in support of this position, and the Court is aware of none. Moreover, three cases belie Plaintiff's argument. In the first, the Michigan Court of Appeals wrote—without further elaboration—that the expectancy of which the interferer must be aware "must generally be specific." *Cedroni Assoc. v. Tomblinson, Harburn Assoc.*, 290 Mich.App. 577, 802 N.W.2d 682, 690 (2010). In the second, another judge of this district, interpreting Michigan law, granted summary judgment for the alleged interferer because the plaintiff failed to rebut the interferer's evidence that he (the interferer) did not know about the *specific* business relationship between the plaintiff and a third party. *See Innovation Ventures, LLC v. N.V.E., Inc.*, 747 F.Supp.2d 853, 865 (E.D.Mich.2010). In the third, a Tennessee appellate court, interpreting the tort under Tennessee law (which is seemingly identical to Michigan law on the subject), wrote that "the defendant must know of the relationship, and this element is not met by 'mere awareness' of plaintiff's general business dealings." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 176 (Tenn.Ct.App.2007). This Court is in agreement with *Cedroni, Innovation Ventures*, and *McCormick*. If knowledge of generalized business dealings were sufficient, the second element of the *P.T. Today* framework (requiring the interferer to have knowledge of "the" expectancy) would become essentially meaningless.

## C. Motion for Summary Judgment of the WSU Defendants

Plaintiff brings several claims against the WSU Defendants. First, Plaintiff alleges that she was retaliated against in violation of Title IX and the ELCRA for complaining of discrimination based on her pregnancy and marital status. Second, Plaintiff alleges that she was discriminated against on the basis of her pregnancy and marital status in violation of Title IX and the ELCRA.[24] Finally, Plaintiff brings claims against Premo, Durack, Vroom, Lee, Prendes, and Brunhofer under 42 U.S.C. § 1983 for procedural and substantive due process violations. The Court addresses these claims, in turn.

### 1. Retaliation Under Title IX and the ELCRA

■■■■ Plaintiff asserts retaliation claims against WSU, Premo, Durack, and Vroom under Title IX and the ELCRA. Retaliation claims under Title IX are analyzed under the same legal framework as claims brought under Title VII. *Nelson v. Christian Bros. Univ.*, 226 Fed.Appx. 448, 454 (6th Cir.2007) (collecting cases). Plaintiffs may prove their discrimination claims by either direct or indirect (circumstantial) evidence. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir.2003) (en banc). On the one hand, "[d]irect evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (internal quotation marks omitted); *see also Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir.2004) (direct evidence "proves the existence of a fact without requiring any inferences"). "Circumstantial evidence, on the other hand, is

proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler,* 317 F.3d at 570.

■■■ Plaintiff believes that she has adduced direct evidence of retaliation because she was officially terminated from WSU's MSW program the day after Premo scolded her for complaining to Durack about discrimination, and told Plaintiff at that time: "You are in deep trouble with me and I am not changing your grade." This is not direct evidence of retaliation because it does not *compel* the conclusion that discrimination was a motivating factor in Premo's decision to terminate Plaintiff from the program. Rather, at least two inferences would have to be drawn before reaching that conclusion, *i.e.,* that Premo was angry with Plaintiff for *complaining of discrimination*—as opposed to the fact that Plaintiff went over Premo's head to a higher authority—and that Plaintiff's complaint to Durack actually factored into Premo's decision.

Because Plaintiff has no direct evidence, she must rely on circumstantial evidence. The Second Circuit has recently set forth the applicable framework under Title IX:

> As in the context of Title VII, a plaintiff claiming retaliation under Title IX must first establish a *prima facie* case by showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action. "Close temporal proximity between the plaintiff's protected activity and the ... adverse action may in itself be sufficient to

---

**24.** Plaintiff's discrimination claim also encompasses a sexual harassment claim. *See*

Second Am. Compl. ¶ 65.

establish the requisite causal connection."

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. After the defendant has done so, the burden shifts back to the plaintiff to demonstrate that the articulated reasons are pretextual. *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 91–92 (2d Cir. 2011) (citations omitted). The WSU Defendants concede the first three elements of Plaintiff's prima facie case. They contest only the fourth element—causation.

Essentially, the WSU Defendants argue that if Premo's motivation for failing Plaintiff was really retaliatory, she would not have waited until the very end of the semester to fail her; rather, she would have done so long before. The argument is not persuasive in light of the Sixth Circuit's decision in *Hamilton v. General Electric Company*, 556 F.3d 428 (6th Cir.2009). There, the Sixth Circuit held that an instance of favorable treatment occurring after an employee engages in protected activity does not insulate the employer from liability, because the employer could "stage" the favorable treatment with the intent to take adverse action at its next opportunity. *Id.* at 436. The Court finds the *Hamilton* court's reasoning applicable here. Taking the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that it would have been too dangerous for Premo to terminate Plaintiff from the program before the end of the semester. Clearly, in academia, the most appropriate and likely time to receive a failing grade is at the end of the term, when grades are assigned and issued.

The Court finds that Plaintiff has satisfied her prima facie burden on causation. The record reflects that Plaintiff engaged in protected activity throughout the entire semester, beginning shortly after the January 17, 2008 meeting between Plaintiff, Premo, and Durack. Plaintiff argues that temporal proximity supports her prime facie case on the theory that Premo issued her failing grade (on May 2, 2008), only one day after Plaintiff complained to Durack about Stefanski's evaluation (on May 1, 2008), and a mere few days after Plaintiff filed her complaint with WSU's OEO (on April 29, 2008).

Preliminarily, the Court notes that Plaintiff complained often about purported discrimination throughout the semester. In cases of continuous exercise of protected activity, any adverse action, if it is to occur, is likely to occur near in time to protected activity. *See, e.g., Gray v. City of Montgomery*, 756 F.Supp.2d 1339, 1350–1351 (M.D.Ala.2010). Plaintiff's argument that the causation requirement is satisfied based on the temporal proximity between her late-semester complaints and the issuance of the failing grade ignores the fact that Plaintiff complained numerous times about discrimination much earlier, beginning right after the January 17, 2008 meeting. The late-semester complaints occurring close in time to the issuance of Plaintiff's failing grade (i.e., Plaintiff's complaint to OEO on April 29 and her telephone call to Durack on May 1) did not add anything new to the fray, other than to perhaps formalize the complaints made by Plaintiff numerous times earlier.

Notwithstanding this potential problem with Plaintiff's causation argument, the Court concludes that, taking the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that the formalization of Plaintiff's discrimination complaints, which occurred on April 29, 2008 when Plaintiff filed her OEO complaint, made the WSU administration—including Premo—angry. A reasonable jury could

conclude that this, in turn, led Premo to issue the failing grade a mere two days later on May 2, 2008.

On the question of whether temporal proximity is alone sufficient to establish causation, the Sixth Circuit has written the following:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.2008). *See also DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir.2004) ("[I]n certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, ... close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise."). By the same token, "[w]here the nexus is not 'very close,' [the Sixth Circuit has] declined to find a causal connection based on timing alone." *Lindsay v. Yates*, 578 F.3d 407, 418–419 (6th Cir.2009).

How close is "very close?" In *DiCarlo*, the Sixth Circuit held that a twenty-one day lapse between protected activity and adverse action was sufficient to create an inference of retaliatory motive without additional evidence. 358 F.3d at 421. Significantly less time elapsed in the present case. Thus, Plaintiff has satisfied her burden on the causation element of her prima facie case based on temporal proximity alone, even in the absence of other evidence of retaliation.[25]

■ The burden now shifts to the WSU Defendants to articulate a legitimate, nondiscriminatory reason for its actions. They have done so here; they claim that Plaintiff was terminated from the MSW program based on inadequate performance. This reason is supported by the record.

In the final step of the analysis, the burden shifts back to Plaintiff to demonstrate that the purportedly legitimate reasons offered by the WSU Defendants are pretextual. A party claiming retaliation can establish that a proffered reason is pretextual by showing that the reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703–704 (6th Cir.2007). The WSU Defendants argue that there is no fact issue on pretext because "Plaintiff admits to numerous performance problems." However, Plaintiff easily creates a fact issue on the question of whether the WSU Defendants' proffered reason—namely, performance issues—was the true reason for the failing grade, in light of Premo's statement to Plaintiff a mere *two weeks before Stefanski*

---

**25.** Plaintiff's recitation of other evidence of retaliation, Resp. at 15, contains at least one item supportive of a retaliatory motive, namely Premo's testimony that she was "frustrated" with Plaintiff for contacting Durack, although Premo may well have been more concerned that Plaintiff was not following the purported chain of command. Other items of evidence—such as Durack's description of Plaintiff's file as "as thick as a phone book" and Vroom's characterization of Plaintiff's claims as "totally implausible"—are not indicative of retaliatory motive. Nonetheless, Plaintiff's showing, at this point, is sufficient to establish a prima facie case on causation.

*issued her review of Plaintiff* that Plaintiff was "doing great." Premo Dep. at 353. The WSU Defendants are hard-pressed to rely on performance deficiencies when Plaintiff's ultimate evaluator—Premo— told Plaintiff as the semester was nearing an end that she was "doing great." Nothing catastrophic happened between the time of that statement and the issuance of her final grade.[26] For all these reasons, Plaintiff's retaliation claim survives summary judgment.

### 2. Discrimination Claims Under Title IX and the ELCRA

Plaintiff alleges that WSU, through Premo, Durack, and Vroom, discriminated against her because she was unmarried and pregnant. Under Title IX,

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681. The ELCRA contains similar language. *See* Mich. Comp. Laws § 37.2402(a) ("An educational institution shall not . . . [d]iscriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of . . . or sex.").

■ A threshold question about which the parties argue is whether Title IX applies to claims for discrimination on the basis of marital status.[27] However, the Court need not decide this issue because there is simply no evidence of marital-status discrimination by the WSU Defendants held a discriminatory animus toward her because she was unwed, or that her marital status played any role in the adverse action. In fact, Plaintiff has presented no evidence that the WSU Defendants even knew Plaintiff was unmarried at the time Premo assigned Plaintiff a failing grade.[28] Therefore, Plaintiff's case must be analyzed based only on a claim of pregnancy discrimination, which is unquestionably covered as a subset of sex discrimination under Title IX and the ELCRA.

■ Discrimination claims under Title IX are analyzed under the same legal framework as claims brought under Title VII. *See Nelson v. Christian Bros. Univ.*, 226 Fed.Appx. 448, 454 (6th Cir.2007) (collecting cases). Plaintiffs may prove their discrimination claims by either direct or indirect (circumstantial) evidence. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d

---

**26.** The case on which the WSU Defendants rely—*Ivan v. Kent State University*, 863 F.Supp. 581 (N.D.Ohio 1994)—is not as analogous to the present case, as the WSU Defendants suggest. The plaintiff in *Ivan* was a pregnant graduate student who alleged that her university discriminated against her on the basis of her pregnancy. The court granted summary judgment in favor of the university, finding that the student had not met her burden on pretext. However, in the words of the court, the student did "not provide[] any evidence suggesting that [the university's] legitimate reasons for assigning the [adverse grade] have no basis in fact, or did not actually motivate the assignment of the [adverse grade." *Id.* at 586. The same is not true here.

**27.** The ELCRA expressly encompasses marital status discrimination. *See* Mich. Comp. Laws § 37.2102 ("The opportunity to obtain . . . the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of . . . sex [and] marital status . . . is recognized and declared to be a civil right."). By contrast, Title IX does not say one way or another whether marital status is a protected class.

**28.** While there is evidence that Stefanski harbored marital-status animus toward Plaintiff, that animus is not imputable to the WSU Defendants, as discussed below.

564, 570 (6th Cir.2003) (en banc). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (internal quotation marks omitted); *see also Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 548 (6th Cir.2004) (direct evidence "proves the existence of a fact without requiring any inferences"). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler,* 317 F.3d at 570.

Plaintiff argues that Stefanski's bias toward Plaintiff should be imputed to the WSU Defendants and, specifically, Premo, on a so-called "cat's paw" theory pursuant to *Staub v. Proctor Hospital,* —— U.S. ——, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011). Alternatively, Plaintiff argues that she has adduced sufficient evidence, both direct and circumstantial, that the WSU Defendants themselves—namely, Premo and Durack—held their own discriminatory animus toward Plaintiff based on her pregnancy.

■ Plaintiffs who proceed on a cat's paw theory typically claim that a biased subordinate, who does not have ultimate decisionmaking authority, exerts influence on the ultimate decisionmaker, who is not biased, thereby masking the biased subordinate's discriminatory intent. *See Arendale v. City of Memphis,* 519 F.3d 587, 604 n. 13 (6th Cir.2008) ("When an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, … the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability."). In essence, Plaintiff argues that Premo—even if not herself biased against

Plaintiff—was influenced by a biased individual—Stefanski—who infected Premo's decisionmaking process with discriminatory animus.

The seminal case on cat's paw law is *Staub.* There, the United States Supreme Court held that an employer is liable for discrimination under the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* (which contains language similar to Title VII and Title IX) on a cat's paw theory if: (1) a biased subordinate performs an act motivated by unlawful animus that is intended to cause an adverse employment action, and (2) that act is *a* (not necessarily *the*) proximate cause of the ultimate employment action. Under this framework, employers may be liable on a cat's paw theory if the decisionmaker relied at all on information tainted by the biased subordinate.

Critically, however, the *Staub* decision rests on agency principles. That is, *Staub* holds employers liable for the discriminatory animus of their agents: "The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." *Staub,* 131 S.Ct. at 1193. The agent/employee status of the individual harboring the discriminatory animus is essential, because otherwise an employer could be held liable for taking into account input from a person who is neither an employee nor an agent and over whom the employer has no element of control. In the absence of discriminatory intent on the part of an agent/employee, *Staub* makes it clear that an employer cannot be liable. *Id.* at 1194 n. 4 ("Needless to say, the employer would be liable only when the supervisor acts within the scope of his employment, or when the supervisor acts outside the scope of his employment and

liability would be imputed to the employer under traditional agency principles.").

Here, although the record is clear that (1) Premo relied on Stefanski's evaluation of Plaintiff, in part, in assigning Plaintiff her failing grade, and (2) there is a fact issue as to whether Stefanski held a discriminatory animus toward Plaintiff based on the fact that she was unmarried and pregnant, the imposition of liability under a cat's paw theory is not a viable legal theory. This is because Stefanski, the individual who is allegedly responsible for poisoning Premo's decisionmaking process, is neither an employee, nor an agent, of WSU, as discussed above.[29] Thus, *Staub's* cat's paw theory is inapplicable.

Nor has Plaintiff adduced any direct evidence of discrimination. The only purported direct evidence offered by Plaintiff is Premo's statement that Plaintiff might have to "drop out of the program due to [her] pregnancy." Defendants argue that the statement was a "stray remark," made in the context of "a Faculty Advisor discussing all of Plaintiff's options and avenues under WSU's policies if Plaintiff fails to complete her placement." Regardless, the Court concludes that the statement is not direct evidence of discrimination because it does not "require" the conclusion that discrimination was a motivating factor in Premo's ultimate decision to fail Plaintiff.

■ This leaves only the circumstantial evidence approach as Plaintiff's remaining avenue to show unlawful pregnancy discrimination. Because Title IX claims are analyzed using Title VII's legal framework, *Nelson*, 226 Fed.Appx. at 454, the Court utilizes the framework set forth by the Sixth Circuit in *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651 (6th Cir.2000), a Title VII pregnancy discrimination case. To make out a prima facie case of pregnancy discrimination, a plaintiff must show that:

1) she was pregnant, 2) she was qualified for her job, 3) she was subjected to an adverse employment decision, and 4) there is a nexus between her pregnancy and the adverse employment decision.

*Id.* at 658. *See also Mullins v. U.S. Bank*, 296 Fed.Appx. 521, 525 (6th Cir.2008) (utilizing the *Cline* test in a Title VII case); *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir.2006) (same).[30] If a prima facie

**29.** The Court previously determined that no agency relationship exists between WSU and SA under Michigan law, and it discerns no material difference between Michigan law on agency and federal law on agency, as both bodies of law adhere to the Restatement of Agency approach. *See* footnote 13, above.

**30.** The WSU Defendants urge, and Plaintiff does not object to—application of the prima facie framework set forth in *Darian v. University of Massachusetts Boston*, 980 F.Supp. 77, 91 (D.Mass.1997). There, the court set forth the framework as follows:

To prove a violation of Title IX, a plaintiff must establish a prima facie case by showing a preponderance of the evidence that: (1) she was a member of a protected class; (2) she was performing the academic requirements at a level well enough to meet her educator's legitimate expectations; (3) she suffered adverse treatment; and, (4) the educational program continued to instruct and credit other students.

*Id.* The first three elements of the *Darian* framework essentially track the first three elements of the *Cline* framework. However, the two frameworks diverge inasmuch as the fourth element of the *Darian* framework does not require any showing of a "nexus" between the adverse action and pregnancy discrimination. The *Darian* framework has never been adopted or utilized by the Sixth Circuit (or by any federal appellate court, for that matter), although one lower court within the Sixth Circuit has applied it. *See McConaughy v. Univ. of Cincinnati*, No. 08–CV–320, 2010 WL 6511141, at *7 (S.D.Ohio Sept. 28, 2010). Moreover, the law in the Sixth Circuit is very clear that (1) the *Cline* framework applies to pregnancy discrimination claims under Title VII, and (2) Title IX

case is established, the burden shifts to the university, which must then articulate a legitimate non-discriminatory reason for excluding the plaintiff. If the university is able to articulate such a reason, the plaintiff must demonstrate that the proffered reason is pretext. *Id.* A party claiming discrimination can establish that a proffered reason is pretextual by showing that the reason (1) has no basis in fact, (2) did not actually motivate the university's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Clay v. United Parcel Serv., Inc.,* 501 F.3d 695, 703–704 (6th Cir.2007).

With regard to Plaintiff's pregnancy discrimination claim, only the second and fourth *Cline* elements present any issue. There can be no dispute that Plaintiff has satisfied the first and third elements of the *Cline* framework because she was pregnant and suffered an adverse action. Moreover, for the reasons discussed above, in connection with Plaintiff's retaliation claim, the WSU Defendants have proffered a sufficient legitimate and non-discriminatory reason for failing Plaintiff, *i.e.,* performance issues. In turn, Plaintiff has satisfied her burden of demonstrating the existence of a fact issue on pretext in light of Premo's statement near the end of the semester that Plaintiff was "doing great." [31] Therefore, the fate of Plaintiff's pregnancy discrimination claim hinges entirely on whether Plaintiff can satisfy the second and fourth elements of her prima facie case.

As to the second element—which essentially requires Plaintiff to show that she performed adequately as a student at WSU—the Court notes that the prima facie showing in the context of a Title IX claim "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Hogan v. Ogden,* No. 06–5078, 2008 WL 2954245, at *9 (E.D.Wash. Jul. 30, 2008). Here, the adequate performance inquiry merges with the pretext inquiry, as both involve issues related to Plaintiff's performance. On the one hand, a reasonable jury could find that Plaintiff's performance as a field intern was inadequate, thereby justifying the failing grade. The record reflects that she did poorly at the VA, and was given a second chance at SA, where she continued to encounter substantial difficulties. On the other hand, Plaintiff was told by her evaluator, as the semester was nearing an end, that she was "doing great." Taking the facts in the light most favorable to Plaintiff, the non-moving party, a reasonable jury could interpret this statement as circumstantial evidence suggesting that Plaintiff was performing adequately, in the eyes of her evaluator, and that Premo's stated reasons for assigning a failing grade were not honestly held. The Court leaves it to the jury to resolve this conflict.

The Court also concludes that Plaintiff has satisfied her burden as to the fourth element of the *Cline* framework, namely, the existence of a nexus between her pregnancy and the issuance of a failing grade. After the January 17, 2008 meeting, Premo told Plaintiff that she might have to "drop out of the program due to [her] pregnancy." While this statement does not constitute direct evidence of discrimination for the reasons explained above, taking the facts in the light most favorable

---

claims are analyzed under the same legal framework as Title VII claims. Thus, the Court applies *Cline.*

**31.** Again, as discussed in the retaliation section of this opinion, a reasonable jury could

find that Premo's statement, which is not contested, tends to show that inadequate performance "did not actually motivate the university's challenged conduct." *Clay,* 501 F.3d at 703–704.

to Plaintiff, a reasonable jury could conclude from the statement that Premo harbored some animus toward Plaintiff based on her pregnancy. Given that the burden at the prima facie stage is "minimal," the Court concludes that the fourth *Cline* requirement is satisfied based on Premo's statement.

 The WSU Defendants argue that Plaintiff cannot establish a prima facie case of discrimination in light of the so-called "same-actor inference," adopted by the Sixth Circuit in *Buhrmaster v. Overnite Transportation Company,* 61 F.3d 461 (6th Cir.1995). That inference "allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." *Id.* at 463. The rationale underlying the inference is that an employer would presumably not hire an individual in a protected class if the employer held a discriminatory animus toward persons in that class. *See, e.g., Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 175 (8th Cir.1992) ("It is simply incredible ... that the company officials who hired [an employee] at age fifty-one had suddenly developed an aversion to older people two years later.").

The WSU Defendants argue that Premo would not have issued Plaintiff a passing grade with regard to her internship at the VA if she truly harbored an animus toward Plaintiff because she was pregnant. The argument is unpersuasive for two independently sufficient reasons. First, the WSU Defendants have not cited any authority demonstrating that the inference applies outside the employment context, and specifically outside the context of a company representative who is involved in hiring the employee.[32] Second, and in any event, in the Sixth Circuit, the same-actor inference "is by no means a mandatory one." *Wexler,* 317 F.3d at 573. *See also Washburn v. Gen. Elec. Capital, Corp.,* No. 09–CV–10202, 2011 WL 2893054, at *8 (E.D.Mich. Jul. 20, 2011) ("[T]he Sixth Circuit rejected the idea that a mandatory 'same-actor inference' be applied 'in favor of a summary judgment movant.' "). The same-actor inference is not a bar here.

Accordingly, the Court grants summary judgment to the WSU Defendants with respect to any claim for marital-status discrimination, but denies summary judgment as to Plaintiff's pregnancy discrimination claim.

### 3. Sexual Harassment

 The Supreme Court has held that "sexual harassment is intentional discrimination encompassed by Title IX's private right of action." *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 174, 125 S.Ct.

---

**32.** The hiring context is not analogous to the present context, where a school official has undertaken adverse action against a student already admitted to a program. It makes sense that a company official, who possesses a discriminatory animus at the time of termination, would likely have possessed that same animus at the time of hiring, and would likely have acted on that animus to bar the hiring in the first instance. However, the hiring official undoubtedly senses greater freedom to act on a prohibited animus than a school official deciding whether to terminate a student from a program. At the hiring stage, the official may perceive that he can act on his animus without detection. By contrast, a school official deciding whether to act on her animus to effect a termination may feel more constrained by virtue of the need to justify the termination in the light of the student's history at the school. Thus, in this case, Premo may have harbored prejudice based on Plaintiff's pregnancy status at the time of the VA episode, but simply not believed that the circumstances were such as to justify acting on that animus by dismissing Plaintiff from the program at that time; later circumstances may have emboldened Premo to act on the alleged bias. Therefore, in the absence of any authority supporting application of the same-actor inference outside the hiring context, the Court will not apply that inference here.

1497, 161 L.Ed.2d 361 (2005). Sexual harassment claims brought under Title IX are governed by the same legal framework as sexual harassment claims brought under Title VII. *Papelino*, 633 F.3d at 89. As recently summarized by the Second Circuit:

> For an educational facility to be liable, however, the plaintiff must establish that a school official with "authority to address the alleged discrimination and to institute corrective measures" had "actual knowledge" of the discrimination and failed to adequately respond. A school fails to adequately respond if it provides no response or if it provides a response that "amount[s] to deliberate indifference to discrimination." The school's response to sex discrimination must be "clearly unreasonable" in light of known circumstances.

*Id.* (citations omitted).

■ There are two kinds of sexual harassment claims under Title VII: *quid pro quo* sexual harassment and sexual harassment that results from a hostile or offensive work environment. *Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (6th Cir.1986). Plaintiff alleges only the latter type. To make out such a claim, a

> Title IX plaintiff must show that he subjectively perceived the environment to be hostile or abusive and that the environment objectively was hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his educational environment.

*Papelino*, 633 F.3d at 89. Title IX plaintiffs have a heavy burden; they must show "harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). In determining whether this standard has been met, a court considers four factors: (1) the conduct's severity; (2) the frequency of the abusive conduct; (3) whether the conduct is physically threatening or humiliating rather than merely offensive; and (4) whether the conduct unreasonably interferes with the plaintiff's performance. *See Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In applying these factors, the Supreme Court has stated that sporadic use of abusive language, gender-related jokes, or occasional episodes of harassment do not suffice. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

■ The conduct at issue here comes nowhere near the level necessary under the cases discussed above. In short, the following acts serve as the basis for Plaintiff's sexual harassment claim:

- Stefanski's comments regarding Plaintiff's clothing, belly-rubbing, and that beneficiaries at SA may find Plaintiff's pregnancy sexually stimulating.

- Premo's requests that Plaintiff wear looser clothing and stop rubbing her belly.

- Premo's statement that Plaintiff might have to "drop out of the program due to [her] pregnancy."

- Maloney's "beached whale" comment.

The first factor under *Harris*—severity—tips in favor of the WSU Defendants. None of the comments is objectively severe in nature. With regard to the comments about Plaintiff's clothing and belly-rubbing, Durack testified that such comments are acceptable and not inappropriate in the context of the social work envi-

ronment at SA, Durack Dep. at 186–187, and Premo testified that her comments to Plaintiff about her clothing and belly-rubbing were made out of concern for Plaintiff. Premo Dep. at 118, 121. The record does not contain testimony, or other evidence, to the contrary. In any event, regardless of whether the comments were inappropriate, the fact that their appropriateness is even debatable, and that the comments were arguably made with Plaintiff's best interest in mind, certainly tends to cut against a severity finding.

The second and third *Harris* factors—the frequency of the abusive conduct and whether the conduct is physically threatening or humiliating rather than merely offensive—both clearly weigh in favor of the WSU Defendants. The record reflects that comments about Plaintiff's clothing and belly-rubbing—to the extent they are inappropriate and the proper basis for a sexual harassment claim in the first place—were not made on a regular basis. Rather, the issue came up from time to time during the semester, falling far short of "pervasive" conduct. And none of the comments was physically threatening.

The final *Harris* factor is whether any harassment interfered with Plaintiff's performance. The record does not contain any evidence that the supposed harassment interfered with Plaintiff's ability to accomplish her academic mission.

Plaintiff's sexual harassment claim fails because no reasonable jury could find the conduct at issue here to be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *See Davis*, 526 U.S. at 633, 119 S.Ct. 1661.

### 4. Procedural & Substantive Due Process Claims

The Fourteenth Amendment to the United States Constitution prohibits the states from depriving a person of life, liberty or property without due process of law. U.S. Const. amend. XIV. Plaintiff alleges that Premo, Durack, Vroom, Lee, Brunhofer, and Prendes violated her procedural and substantive due process rights. The Individual WSU Defendants argue that even if they are not entitled to qualified immunity, summary judgment should be granted in their favor on the merits, because they did not violate any procedural or substantive due process right held by Plaintiff. For the reasons that follow, the Court agrees with the Individual WSU Defendants' argument that they are entitled to qualified immunity.

Qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The court must "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all" and, if so, "whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). For a right to be clearly established, "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). As the Supreme Court has written, "[i]f judges ... disagree on a constitutional question, it is unfair to subject [government officials] to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

#### a. Procedural Due Process

In *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 98

S.Ct. 948, 55 L.Ed.2d 124 (1978), the United States Supreme Court discussed the scope of a public university student's procedural due process right to continued enrollment. The Court did not hold that the right exists; rather, it assumed that the right exists, and held that any arguable procedural due process requirements are satisfied so long as the student is "fully informed ... of the faculty's dissatisfaction" and the decision to dismiss is "careful and deliberate." *Id.* at 84, 98 S.Ct. 948. The Court wrote: "Assuming the existence of a liberty or property interest, respondent has been awarded at least as much due process as the Fourteenth Amendment requires." *Id.* at 84–95, 98 S.Ct. 948.

 Following *Horowitz*, federal courts have been divided on the question of whether students at public universities enjoy a procedural due process right to continued enrollment. As noted by the Sixth Circuit about two and a half years before the alleged procedural due process violation occurred in the present case:

> The issue of whether a student's interest in continued enrollment at a postsecondary institution is protected by procedural due process has not been resolved. Courts have avoided this issue where possible by assuming for the sake of argument that such an interest exists.

*McGee v. Schoolcraft Cmty. Coll.,* 167 Fed. Appx. 429, 437 (6th Cir.2006). And as of April 2008—the very same time when the Individual WSU Defendants are alleged to have violated Plaintiff's procedural due process rights—courts remained divided on the issue. *Zwick v. Regents of Univ. of Mich.,* 2008 WL 1902031, at \*\*4–5 (E.D.Mich. Apr. 28, 2008) (collecting cases, and noting that they have "left a great deal of ambiguity"). *See also Lee v. Univ. of Mich.-Dearborn,* No. 06–CV–66, 2007 WL 2827828, at \*\*7–9 (W.D.Mich. Sept. 27, 2007) (noting split in authority, and finding

the issue to be an "open question"). To be sure, Plaintiff advances cogent arguments in support of her position that, first, the right exists and, second, fact issues remain as to whether the right has been violated here. However, in light of the authority discussed above, the Court simply cannot conclude that Plaintiff held a "clearly established" constitutional right to continued enrollment at WSU at the time of the alleged violation. Accordingly, the Individual WSU Defendants are entitled to qualified immunity on Plaintiff's procedural due process claim.

### b. Substantive Due Process

 Plaintiff argues that her substantive due process rights were violated because the actions of the Individual WSU Defendants "were the opposite of 'careful and deliberate,'" and because "the evidence of bad faith is crystal clear." Pl. Resp. at 17, 19. However, beyond these conclusory statements, Plaintiff does not specify the exact basis underlying her substantive due process claim. For the reasons that follow, the Court finds that, regardless of the contours of Plaintiff's substantive due process claim, it is doomed because, at a minimum, the alleged right was not "clearly established" at the time of the alleged violation.

In *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 222–223, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the Supreme Court assumed without deciding that a student's interest in continued enrollment at a state university is protected by substantive due process. Assuming *arguendo* the right exists, both the Supreme Court and the Sixth Circuit have instructed that courts are to review academic dismissals with great deference to the school:

> When reviewing the substance of academic decisions, courts "should show great respect for the faculty's profes-

sional judgment" and "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Id.* at 225 n. 11, 106 S.Ct. 507 (quoting *Horowitz,* 435 U.S. at 96 n. 6, 98 S.Ct. 948 (Powell, J., concurring)).

*Ku v. State of Tenn.,* 322 F.3d 431, 438 (6th Cir.2003).

However, after *Ewing* and *Ku,* the Sixth Circuit held, in a published decision, that a student has no substantive due process right in continued enrollment at a state university. *See Bell v. Ohio State Univ.,* 351 F.3d 240, 251 (6th Cir.2003). In *Bell,* the plaintiff-medical student alleged that her substantive due process rights were violated when the school allegedly arbitrarily and capriciously dismissed her from the program, a claim similar to the one Plaintiff advances here. The Sixth Circuit affirmed the district court's grant of summary judgment in favor of the school, explaining: "Where ... there is no equal protection violation, we can see no basis for finding that a medical student's interest in continuing her medical school education is protected by substantive due process." *Id.* Here, Plaintiff has not alleged an equal protection violation; thus, under Bell, no substantive due process right to continuing enrollment exists.[33] Bell would warrant entry of summary judgment in favor of the Individual WSU Defendants to qualified immunity on the claim.

## V. CONCLUSION

For the reasons stated above, it is ordered as follows:

(1) SA's motion for summary judgment (Dkt. 54) is granted.

(2) Stefanski's motion for summary judgment (Dkt. 55) is granted.

(3) The summary judgment motion of the WSU Defendants (Dkt. 56) is granted in part and denied in part as follows:

(a) Denied as to Plaintiff's pregnancy discrimination and retaliation claims under Title IX and the ELCRA.

(b) Granted as to Plaintiff's marital-status discrimination claims under Title IX and the ELCRA.

(c) Granted as to Plaintiff's sexual harassment claim under Title IX.

(d) Granted as to Plaintiff's procedural and substantive due process claims.

---

**33.** The one case on which Plaintiff relies in support of her substantive due process argument—*Alcorn v. Vaksman,* 877 S.W.2d 390 (Tex.App.1994)—is inapposite because *Alcorn* recognizes a right expressly rejected by Bell, a case by which this Court is bound.